984 So.2d 229 (2008)
Willard Wardell HILL, Jr.
v.
Ethel Fischer HILL.
No. 08-CA-197.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
Rehearing Denied June 30, 2008.
*231 Willard W. Hill, Jr., Attorney at Law, New Orleans, LA, for Plaintiff/Appellant.
Willie M. Zanders, Sr., Attorney at Law, New Orleans, LA, for Defendant/Appellee.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and GREG G. GUIDRY.
GREG G. GUIDRY, Judge.
Plaintiff, Willard Wardell Hill, appeals[1] from the trial court judgment in favor of his former wife, Ethel Fischer Hill, denying his request for reimbursement of separate funds he used to pay joint debts secured by a mortgage on the jointly owned property comprising the family home, denying his request to reimburse a person who loaned him money to settle the indebtedness encumbering the property, and distributing the net proceeds deposited in the registry of the court after the sale of the property by dividing them equally between the parties. For the reasons which follow, we amend in part and in all other respects affirm the trial court judgment.
The parties were married on March 20, 1993. Ethel had three children from a previous marriage and Willard had two. The parties entered into a pre-nuptial agreement creating a separate property regime.[2] On December 3, 1997, Willard donated "one-half of his right, title and interest" in the family home, located at 5232 St. Bernard Avenue, New Orleans, Louisiana, to Ethel. Ethel accepted the donation. The property had been purchased by Willard on November 29, 1994, and had a 30 year mortgage on it. At the time of the donation, Willard testified that the mortgage note had a $111,000.00 balance due. The parties re-financed the loan on the property with a new mortgage on March 30, 1998. Both parties signed the agreement with Chase Home Finance. On July 23, 1998, the parties also entered into a Bank One[3] Home Equity Line of Credit for $50,000.00. The testimony also indicates that during the period, from the refinancing in 1998 until June 19, 2003, when the petition for divorce was filed,[4] the parties maintained two joint checking accounts. Both accounts had both parties' names on them. One account was primarily used by Willard and had his name listed first and the other account was primarily used by Ethel and had her name listed first. However, the testimony indicated that both parties were authorized to and occasionally did use both accounts. The parties were divorced by judgment entered on May 11, 2004.
It is well known that in the end of August 2005, Hurricane Katrina caused massive destruction of property in the New Orleans area, including to the Hills' jointly owned property. On October 6, *232 2006, Chase Home Finance reported that the loan debt on the jointly owned property, secured by a mortgage thereon, totaled $114,211.53.[5] Willard testified that the balance outstanding on the J.P. Morgan Chase line of credit, also secured by mortgage on the jointly owned property, was approximately $72,000.00. Insurance proceeds collected for hurricane damage to the property totaled $122,559.74.[6] A buyer was located for the property, provided the mortgages thereon were first removed. Through negotiations, the first mortgage was paid off and cancelled and the holder of the line of credit debt agreed to release its security interest on the property and forgive any deficiency balance in return for a payment of $17,560.00. Willard testified that he secured the requested amount of money, in part, through a loan for $8,489.21 from a private individual, Dr. Yvonne Allen. He paid J.P. Morgan Chase the $17,560.00 to free the property for sale. It was sold on November 15, 2006, for the net amount of $54,855.31.[7] This sum was placed in the registry of the court for a determination of the proper disbursement between the parties.
Willard contended that he should be awarded the entire sum. He offered two arguments in support of his claim. First, he argued, and filed a rule to show cause in support, that Allen, who had loaned him $8,489.21 to perfect the settlement with J.P. Morgan Chase, should be paid from the proceeds of the sale before any distribution between the parties. Second, he argued that he made all payments on the house loan from his separate funds during the period from 1998 through July 2003, totaling $63,888.66, and all loan payments on the line of credit during that same period, totaling $24,195.32. Therefore, he contends he should be awarded the remainder of the funds in the registry of the court for reimbursement of his separate funds used to pay joint debts.
Ethel argues that she was given a one-half interest in the property the parties used as their family home by gratuitous donation for the consideration of "love and affection," and not subject to any debts. She further argues that any funds in the joint bank accounts should be deemed "community" funds. She argues that any funds deposited by Willard in the joint accounts were commingled with community funds indiscriminately such that the separate funds can no longer be identified. Further, Ethel argues that Willard did not meet his burden of proving his right to reimbursement for payments made on the mortgage note or the line of credit debt.
The trial court denied both of Willard's reimbursement motions. The trial court found that "the evidence shows that separate and community funds, especially two joint bank accounts and all funds from a $50,000 line of credit approved and accepted by both parties, were commingled indiscriminately so that separate funds could not be identified or differentiated from community funds." The trial court ordered that the $54,855.31 in the registry of the court be divided equally between the parties after court costs and fees were *233 paid. It is from this judgment that Willard appeals.
In his first assignment of error, Willard argues that the trial court erred in basing its ruling on a finding that Willard "commingled" his separate and community funds. We agree with this argument. In previous litigation between these parties, it was determined that these parties entered into a prenuptial agreement and established a separate property regime. Having no community property regime, the parties had no community property. Therefore, Willard is correct in his argument that the trial court fell into error in finding that his separate funds were commingled with "community" funds because there were no community funds.
Next, Willard argues that the trial court erred in finding that the agreement in which Ethel acquired a one-half interest in the family home, located at 5232 St. Bernard Avenue, was a gratuitous donation or gift with no concomitant liability for the mortgage note encumbering the property. He contends that, when the loan on the property was refinanced shortly after the donation, and signed by both parties, Ethel obligated herself contractually by signing the debt instrument.
Ethel argues that when Willard gave her the one-half interest in the property, he did not condition the gift on her paying the mortgage note. To the contrary, the act giving her the property provided that "the consideration for this donation is love and affection."
A gratuitous donation is one which is made without condition and merely from liberality. La. C.C. art. 1523. Review of the document by which Ethel acquired a one-half interest in the property clearly indicates that it was a gratuitous donation. No conditions were placed on the transfer. The act itself is titled "Donation Inter Vivos," and the transaction is referred to as a "donation" therein. The stated consideration is love and affection and nothing else. Thus, contrary to Willard's argument, we find that the act, dated December 3, 1997, in which Willard transferred a one-half interest in the property to Ethel was a gratuitous donation free of any encumbrances. However, we also find that when the property was refinanced, on or about March 30, 1998, and the document was signed by both Ethel and Willard, they became co-debtors on the loan that was secured by the property. Thus, we find this was a joint debt and Ethel was liable for this debt.
Next, Willard argues that the trial court erred in ruling that Ethel did not owe Willard reimbursement for her virile share of the jointly held obligations of the co-owners that was paid by Willard from his separate funds. In this argument, Willard is not only referring to the mortgage indebtedness but is also referring to the "Home Equity Line of Credit" agreement that the parties entered into on July 23, 1998. The line of credit loan agreement was signed by both parties as "Borrower" and also encumbered the co-owned family home. Willard argues that he made all of the payments on both of these debts with his separate funds, excluding the insurance proceeds that were paid toward the loans following the damage to the property from Hurricane Katrina. He contends his payments totaled $88,083.98.
Ethel argues in response that there is an absolute failure of proof by Willard as to how, by whom, or by what funds the mortgage indebtedness and the line of credit debt were paid.
During the marriage, most of the money from the line of credit, a joint indebtedness, went into the joint checking accounts to pay family bills, including the mortgage *234 payment. When Willard was ill, Ethel paid the household bills for the family. Ethel wrote checks primarily from the account with her name listed first, but also wrote checks on the other account. Willard testified that Ethel never made a payment on the mortgage debt. He cited Ethel's deposition testimony in support, claiming she admitted that she never made a payment on the mortgage debt. However, at the hearing, Ethel stated that she had. Willard offered no proof of the source of the deposits to the joint checking accounts or the payee on the withdrawals from the accounts. It appears from tax returns in the record that Ethel maintained employment throughout the marriage and earned an income which could have paid part of the mortgage debt or the line of credit loan.
The parties signed a prenuptial agreement establishing a separation of property regime. Ownership of the same thing by two or more persons is ownership in indivision. La. C.C. art. 797. Thus, the division of property and debts in this case is governed not by the Civil Code articles on community property but by those pertaining to ownership in indivision, La. C.C. arts. 797-818. In the absence of contrary provisions, the shares of co-owners are presumed to be equal. La. C.C. art. 797. An obligation is solidary for the obligors when each obligor is liable for the whole performance. La. C.C. art. 1794. Performance rendered by one solidary obligor relieves the other of liability toward the obligee. La. C.C. art. 1794. Among solidary obligors, each is liable for his virile portion. However, a solidary obligor who has rendered the whole performance, though subrogated to the right of the obligee, may claim from the other obligors no more than the virile portion of each but only to the extent to which the obligor rendered performance. La. C.C. art. 1804; Thibaut v. Thibaut, 04-0782 (La.App. 1 Cir. 5/6/05), 915 So.2d 883.
In this case, the parties jointly executed the necessary documents to refinance their jointly owned property, used as the family home. They also jointly executed a loan document for a $50,000.00 line of credit. Being both liable for the whole of the debts, they were solidary obligors, and between them each owed their virile share, or one-half of the payments. Sampognaro v. Sampognaro, 41,664 (La.App. 2 Cir. 2/14/07), 952 So.2d 775, writ denied, 07-0937 (La.6/22/07), 959 So.2d 500. Thus, Willard has a reimbursement claim for Ethel's virile share of the payments he made on the joint debts, to the extent he can prove he made the payments with his separate funds.
Upon review of the record, we find an absence of proof of the source of the payments made during the marriage on the two joint debts. As to payments made by the couple from their joint checking accounts, we find no proof of the source of funds deposited into those accounts or the payees on the withdrawals. There are copies of a few cancelled checks in the record indicating payments of family obligations by both parties from "Willard's" account. There are also copies of tax returns indicating income earned by both Willard and Ethel. There was also testimony to the effect that some payments on the mortgage debt were made with funds withdrawn from the line of credit. Absent sufficient proof in the record of Willard's claim, that during the marriage he made payments on the mortgage and the line of credit from his separate funds, we find that Willard did not meet his burden of proof to support an award for reimbursement of those payments.
However, following the separation of the parties and the termination of the marriage, the record does support a finding *235 that Willard paid $9,211.80 on the joint debts, after negotiating with the creditors to settle the claims and obtain a release of their security interest in the property and forgiveness of any deficiency balances.[8] This payment terminated the joint debts, Ethel's liability as well as Willard's, inuring to the benefit of both parties and freeing the property for sale to a prospective buyer. Willard paid the total settlement amount and is due, in reimbursement, Ethel's virile share of the payment.
Lastly, Willard argues that the trial court erred in denying reimbursement to Allen, from the property sale proceeds, for funds she loaned Willard, after termination of the marriage, to retire the jointly held debt. We find no merit in this argument. As found by the trial court, Ethel cannot be held liable on a debt contracted by Willard when the parties were no longer married.
Accordingly, for the reasons stated above, we amend the trial court judgment insofar as it denied Willard Hill reimbursement of the separate funds he proved he paid on the joint debts of the parties, $9,211.80, for which he is owed one-half from Ethel Hill, or $4,605.90. As amended, the judgment is otherwise affirmed, distributing the funds deposited in the Registry of the Court, $54,855.31, representing the net proceeds from the sale of the jointly owned family home, plus earned interest, by deducting the $9,211.80, payable to Willard Hill, and dividing the remainder between the parties, after court costs and fees have been paid.[9]
AMENDED AND AFFIRMED.
NOTES
[1] This case is on appeal from Civil District Court for the Parish of Orleans. It was transferred to this Court for appellate review by Order of the Supreme Court, dated February 25, 2008, following recusal by the Fourth Circuit Court of Appeal.
[2] While this document is not in the record, this fact was determined in prior litigation and is not at issue in this appeal.
[3] Bank One was taken over by J.P. Morgan Chase. Further references to this loan are to the J.P. Morgan Chase loan.
[4] Although the judgment of divorce was not entered until May 11, 2004, Willard stipulated that he only sought reimbursement for separate funds he expended on the house note during the marriage, up to the date the petition was filed.
[5] Although the property had been damaged by the hurricane, interest continued to accrue on the loan, according to Willard, at the rate of approximately $8,500.00 per year.
[6] According to Willard, Fidelity Flood Insurance paid the parties $113,300.00 and MetLife Homeowners Insurance paid them $9,259.74.
[7] The property sold for $60,000.00. $54,855.31 was placed in the registry of the court from the sale. Therefore, although Willard asserts that $5,275.00 were paid for commissions and fees, it appears that this sum was $5,144.69.
[8] The record indicates that $114,211.53 was the outstanding balance on the mortgage note on September 1, 2005. Fidelity Flood Insurance paid the couple $113,300.00 and MetLife Auto and Home paid the couple $9,259.74. The mortgage debt was paid in full and the record indicates that the line of credit debt was settled for the payment of $17,560.00. Therefore, based on the figures supported by the record, Willard paid $9,211.80 to settle the debts, secured by mortgages on the jointly owned family home, freeing it for purchase.
[9] Based on the reasoning above, the parties are due equal amounts of the proceeds from the sale of the family home, $54,855.31, or $27,427.65 each, plus earned interest and minus costs and fees. And, they owe equal amounts of the payment to settle the joint debts, $9,211.80, or one half each, $4,605.00. However, since Ethel owes Willard $4,605.90 in reimbursement, that amount must be deducted from her share and paid to Willard.